# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF OREGON

**ELIZABETH L. PERRIS**
CHIEF BANKRUPTCY JUDGE

1001 S.W. FIFTH AVENUE, # 700
PORTLAND, OREGON 97204
(503) 326-1536

DIANE K. BRIDGE, LAW CLERK
MARGOT LUTZENHISER, LAW CLERK

**NOT FOR PUBLICATION**

June 10, 2009

M. Vivienne Popperl
Office of the United States Trustee
620 SW Main Street Rm. 213
Portland, OR 97205

Fred Allman
P.O. Box 5366
Portland, OR 97228

    Re:  <u>United States Trustee v. Allman</u>, Adv. No. 08-3115-elp
           Trial Ruling

Dear Ms. Popperl and Mr. Allman:

    The purpose of this letter is to give you my ruling on the trial in this adversary proceeding. Plaintiff United States Trustee (UST) seeks to deny defendant debtor (debtor) a discharge based on false oaths and concealing financial information.

    The trial began on December 17, 2008. The UST presented his case-in-chief on December 17, and continued in January 2009 for the testimony of the case trustee. In response to debtor's motion to continue the trial, partially based on the fact that debtor was incarcerated at the time, I continued debtor's portion of the case until April 29, 2009. Debtor informed me that he would be released from the county jail in mid-March. I gave him more than a month after his release to prepare to present his side of the case.

    Debtor failed to appear for any of the trial. During the time he was incarcerated, the county sheriff's office offered to transport debtor to court to attend his trial, or to allow him to participate by telephone. Debtor refused to do either. Debtor also failed to appear for the continued trial on April 29, which was his time to present his case. The court was advised that he had been released from jail in March as anticipated, so there was no known impediment to his appearance.

    The UST presented testimony and a number of exhibits were admitted into evidence. The court has reviewed the exhibits, heard the testimony, and considered the argument of counsel for

the UST. For the reasons stated below, debtor's discharge in this bankruptcy case will be denied.

FACTUAL BACKGROUND

This adversary proceeding and the underlying bankruptcy case have a long, difficult history. I will state only those facts, including procedural background, that I find relevant to this adversary proceeding.

Debtor is married to Kimberly Allman (Kimberly). They are now separated. Kimberly has a bachelor's degree in finance law and had a career in financial advising. Debtor has a degree in electrical engineering. He ran a business called RFW Communications in the early 2000s, which did two-way radio consulting.

In 2004, debtor and Kimberly purchased and moved into a house on 40 acres on Worden Hill Road in Dundee, Oregon. They adopted a daughter, after which time Kimberly stayed at home as a homemaker and mother. They created a number of LLCs, all in Kimberly's name only, to operate the family businesses.

In October 2007, Kimberly individually filed a chapter 12 bankruptcy case. In the chapter 12 case, Kimberly disclosed that she had an interest in eight corporations or limited liability companies: Avalon Communications Group, LLC; Avalon Consulting Group, LLC; Avalon Farms, LLC; Avalon Investment Group, LLC; Larson High Technology Services, LLC; Northwest High Technology Services, LLC; Trask Mountain Properties, LLC; and Willamette Electric Group, Inc. During the course of the case, she also disclosed that she owned a limited liability company called KAA, LLC.

During the chapter 12 case, Kimberly testified that, although she was the named owner of the various LLCs, she did not have anything to do with them and that they were in fact run by her husband, debtor Fred Allman.

Kimberly's case included a number of vehicles, including a Hummer and a Porsche, as well as the 40-acre Dundee hill-top property in wine country on which was built a 4500 square-foot home and a horse barn and arena. The property contained some merchantable timber.

While the chapter 12 case was pending, Kimberly filed a chapter 13 case. The chapter 12 case was dismissed with a 180-

day bar to refiling; the chapter 13 case was dismissed for failure to file documents.

Debtor filed this chapter 7 case after Kimberly's chapter 12 and 13 cases had been dismissed. It became apparent that the assets and liabilities of Kimberly, the LLCs, and debtor were intertwined and impossible to separate. In order to bring all of the businesses and assets together, this court substantively consolidated debtor's case with the non-debtor entities Kimberly A. Allman; Avalon Farms, LLC; Avalon Investment Group, LLC; Avalon Communications Group, LLC; Avalon Consulting Group, LLC; and KAA, LLC.

Debtor's bankruptcy petition and schedules indicated that he owned personal property valued at $1,945.00 and no real property. He also listed liabilities of approximately $900,000, although he did not indicate any amounts owing for any of the creditors he listed on his 18 pages of Schedule F, instead indicating only that every single claim was contingent, unliquidated, and disputed, and in an amount of "?".

In light of the property, real and personal, that had been included in Kimberly's bankruptcy filings, the UST and others questioned debtor at length in his continued § 341(a) meeting on May 6, 2008. As a result of that testimony and alleged deficiencies in debtor's bankruptcy schedules, the UST filed this complaint to deny debtor a discharge.

DISCUSSION

The UST claims that debtor's discharge should be denied for two reasons: false oaths under § 727(a)(4)(A) and concealment of financial records under § 727(a)(3).

1.  False oaths - § 727(a)(4)(A)

The UST claims that debtor's discharge should be denied because of false testimony at his § 341(a) meeting that:

    A.   Kimberly manages and runs all of her companies, and debtor acted only under her direction and control;

    B.   Kimberly was actively involved in Willamette Electric Group, Inc.;

    C.   Kimberly was involved in attempting to sell lots owned by Avalon Investment Group, LLC in Tillamook, Oregon;

    D.    Debtor had no control over Avalon Communications Group, LLC, and Kimberly sold all of the assets of that business on eBay in the fall of 2007;

    E.    Kimberly handwrote her income tax returns and debtor only entered the information she prepared into a computerized tax program;

    F.    Debtor has no interest in any real estate, vehicles, or equipment; and

    G.    Debtor listed in his bankruptcy schedules all personal property assets in which he had an interest, including those he controlled, was in possession of, or for which he was the primary user.

Each of these statements, the UST argues, was knowingly and fraudulently made.

    To deny a debtor a discharge under § 727(a)(4)(A), the plaintiff must show that "(1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently." In re Roberts, 331 B.R. 876, 882 (9th Cir. BAP 2005), aff'd, 2007 WL 2089041 (9th Cir. 2007) (unpublished). False oaths include false statements or omissions in the debtor's schedules. In re Khalil, 379 B.R. 163, 172 (9th Cir. BAP 2007); In re Beaubouef, 966 F.2d 174 (5th Cir. 1992); In re Wills, 243 B.R. 58, 62 (9th Cir. BAP 1999).

    Intent must be actual, not constructive. In re Jones, 175 B.R. 994, 1002 (Bankr. E.D. Ark. 1994). Fraudulent intent may be inferred from the actions of the debtor, In re Devers, 759 F.2d 751, 753-54 (9th Cir. 1985), or from the surrounding circumstances. See In re Woodfield, 978 F.2d 516, 518-19 (9th Cir. 1992). Reckless indifference to the truth is not sufficient by itself to establish fraudulent intent, but a court may find intent from reckless conduct, particularly "where there has been a pattern of falsity or from a debtor's *reckless* indifference to or disregard of the truth." Khalil, 379 B.R. at 173 (quoting Wills, 243 B.R. at 64; emphasis added by Khalil).

    For instance, multiple omissions of material assets or information may well support an *inference of fraud* if the nature of the assets or transactions suggests that the debtor was aware of them at the time of preparing the schedules and that there was something about the assets or

M. Vivienne Popperl
Fred Allman
June 10, 2009
Page 5

>     transactions which, because of their size or nature, a
>     debtor might want to conceal.

Id. at 175 (quoting with approval In re Coombs, 193 B.R. 557, 565-66 (Bankr. S.D. Cal. 1996);emphasis added by Khalil). Intent may be established by "[t]he sheer number of material inaccuracies contained in schedules" that a debtor reviewed before filing. In re Hansen, 368 B.R. 868, 878 (9th Cir. BAP 2007).

A false statement is material if it relates to "the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property." Wills, 243 B.R. at 62; In re Chalik, 748 F.2d 616, 618 (11th Cir. 1984). "A false statement or omission may be material even if it does not cause direct financial prejudice to creditors." Wills, 243 B.R. at 63. "[A] discharge may be denied if the omission adversely affects the trustee's or creditors' ability to discover other assets or to fully investigate the debtor's pre-bankruptcy dealing and financial condition." Id. (quoting 6 Lawrence P. King, Collier on Bankruptcy ¶ 727.04[1][b] (15th ed. Rev. 1998)).

In this case, there is no dispute that debtor made statements in his testimony at his § 341(a) meeting of creditors, which was given under oath and in connection with this bankruptcy case. The questions are whether the statements were false, whether they related to a material fact, and whether debtor knowingly and fraudulently made the statements. I will first discuss whether each statement alleged was false.

    A.    <u>Were the statements false?</u>

        i.    <u>Kimberly manages and runs all of her companies, and debtor acted only under her direction and control</u>.

Debtor testified that Kimberly owns, manages, and operates her various companies, and that debtor acted only under her direction and control with regard to the companies. In particular, debtor testified that Kimberly owned and operated Avalon Communications Group, LLC (Exh. 4 at 30:9-12); that Kimberly owned, ran, and operated Avalon Investment Group, LLC (Exh. 4 at 40:24-41:4); and that Kimberly has a number of companies and she manages the financial affairs of those companies (Exh. 4 at 41:5-16, 92:15-16, 102:21-24, 144:13-17).

M. Vivienne Popperl
Fred Allman
June 10, 2009
Page 6

Debtor also testified that he acted for the businesses only under Kimberly's direction and control (Exh. 4 at 31:14-17, 34:15-35:3, 77:16-24, 102:21-24, 120:11-14, 134:20-135:4, 136:1-4, 144:13-17, 147:18-20).

The UST provided evidence showing that these statements were false and that, in fact, debtor was involved in and directed the day-to-day operations of the businesses. Some of the evidence to that effect came from testimony Kimberly gave both in her own case and in this case. The UST also relies on Kimberly's testimony to show that some of debtor's other statements were false.

I first must comment on the credibility of both debtor and Kimberly Allman. I find debtor utterly incredible. This determination is based on debtor's lack of candor in answering questions at his § 341(a) meeting, as well as the fact that some of his testimony was simply beyond belief. For example, he testified that he lived in the barn of the Worden Hill Road property when that barn had no finished room or any working plumbing. His testimony is also contradicted by testimony of people who dealt with him on various projects and in various capacities.

I also have problems with Kimberly's credibility, based on her changing story throughout the course of her case and debtor's case. Although I conclude that her testimony in her December 2008 deposition is closer to the truth than earlier testimony she gave, I will not rely solely on her testimony for any determination in this case. I will rely on her testimony only when it is corroborated by other outside sources.

I turn then to the evidence showing that debtor's statements about the management and control of Kimberly's LLCs and debtor's involvement in them are false. The evidence was overwhelming that debtor was deeply involved with the various companies, in particular Avalon Communications Group, Avalon Investments, Willamette Electric Group, and Trask Mountain Properties. Although I discuss below specific evidence that is sufficient to support my finding, there was additional testimony, unnecessary to discuss in detail, that also supports the finding that the businesses purportedly owned by Kimberly were really run by and under the control of debtor.

Rodolfo Camacho testified in a deposition admitted into evidence at trial that, when he was a trustee for a chapter 7 debtor named Forney, Camacho needed someone to run and possibly

purchase the assets of a wifi business owned by Forney. Exh. 20. Camacho found documents, including a letter of intent, indicating that Avalon Investment Group, LLC was a potential purchaser for the business. The letter of intent to purchase stock was signed by debtor as general manager of Avalon Investment Group. Camacho and his counsel, Matthew Goldberg, who testified at trial, met with debtor to discuss the possible acquisition of the business by Avalon Investment Group. During those discussions, debtor never mentioned Kimberly, either as the owner of the company or otherwise. Nor did debtor indicate in any way that he did not have complete authority to commit to the purchase of the assets of the business or would have to confer with anyone before making that commitment. Debtor had two business cards with his name on them, one for Avalon Investments and one for Avalon Communications.

After the initial meeting with debtor, Camacho and Goldberg learned that Kimberly had filed bankruptcy. When they asked debtor about the filing, he told them that it did not affect his ability to go forward with the deal, because she was not in the picture and he controlled everything. He told them that Kimberly's involvement in Avalon was purely incidental or nominal.

Camacho did not ultimately sell the business to debtor.

The UST also provided the testimony of Angela Jacobs, who was a friend of debtor and Kimberly. During the course of their relationship, Jacobs gave debtor money to invest with Avalon Investment Group. All of Jacobs' interaction relating to the investment was with debtor, not with Kimberly.

At one point, Jacobs had moved to Missouri. Debtor contacted her about a business opportunity in Oregon. Jacobs ended up moving back to Oregon to pursue this business opportunity, assisted by debtor. He was very involved in getting Jacobs settled back in Oregon and in talking to her about the new business and her part in it.

The new business was to be a destination wine resort, using the company Trask Mountain Properties. Jacobs did not deal with Kimberly in working on the new business; she dealt only with debtor. Debtor gave her work to do, which she completed and then sent invoices to Trask Mountain Properties for payment. She was not paid for her work. She never discussed business with Kimberly, only with debtor.

M. Vivienne Popperl
Fred Allman
June 10, 2009
Page 8

Dan Larson testified that he worked with debtor on various possible business ventures, including Larson High Technology Services, LLC and Willamette Electric. Kimberly was never involved in any of the ventures, and his contact with her was solely social. Larson and debtor worked together on the possible purchase of an electrical company under the name Willamette Electric.

Larson also worked with debtor on development lots in Tillamook. Larson was to build homes on the lots after debtor found investors who wanted to buy the lots and build homes on them. This venture was under the name Avalon Investment Group. Debtor signed Vacant Land Standard Sales Agreements for Avalon Investment Group as "seller." Exh. 40, 44.

Larson testified about various other business ventures with debtor and stated that he gave debtor numerous checks for various purposes, all to Avalon Investment Group. All of the business negotiating was done by debtor. None of Larson's extensive business dealings relating to Avalon Investment Group were with Kimberly, other than the fact that she signed checks.

Debtor also was the primary contact for the contractor who built the horse barn on the Worden Hill Road property. Ron Berkey was the contractor, and he dealt solely with debtor with regard to the construction of the barn. Kimberly would come to the construction site occasionally, but she would not direct Berkey's work or discuss the progress of the project with him. Debtor was in charge of the project and was the person who dealt with Berkey. Kimberly wrote checks.

Similar testimony was given by William Reber, who was the excavator on the horse arena. He testified that the arena was being built for Kimberly, but debtor gave the orders. Debtor offered to sell Reber one of the lots in Tillamook. Reber did not have business discussions with Kimberly.

The testimony and exhibits establish that debtor, not Kimberly, had expertise in radio and other communications technologies. He was the face of the various business entities in their dealings with third parties. None of the witnesses who had business dealings with debtor in connection with Avalon Investments, Avalon Communications, Willamette Electric, or Trask Mountain Properties ever had business dealings with Kimberly for those businesses. The evidence convinces me that the businesses, although formed in Kimberly's name, were in fact family

M. Vivienne Popperl
Fred Allman
June 10, 2009
Page 9

businesses in which debtor was deeply involved and over which he had much operational control.

I conclude that debtor's testimony that Kimberly, not debtor, managed and ran all of her companies, and that debtor acted only under Kimberly's direction and control was false.

    ii. <u>Kimberly was actively involved in Willamette Electric Group, Inc.</u>

The UST also proved that debtor testified that Kimberly was actively involved in Willamette Electric Group, Inc. He testified that Kimberly's holding company, KAA, LLC, owned Willamette Electric Group, Kimberly hired a general manager for the company, and Kimberly was actively involved in business. Exh. 4 at 51:20-52:14, 119:4-14, 143:9-12.

The same evidence that supported my conclusion in subsection i. above supports my conclusion that debtor's testimony that Kimberly was actively involved in Willamette Electric Group was also false. In particular, Larson testified that all of his dealings with regard to Willamette Electric Group were with debtor, not with Kimberly. In addition, debtor signed a bankruptcy petition on behalf of Willamette Electric Group. Exh. 11. Kimberly testified that she did not realize that she was the owner of Willamette Electric Group through her holding company, KAA, LLC, until she got a notice from the Oregon taxing authorities. Exh. 21 at 33:20-34:18, 71:13-72:1, 139:1-141:20.

I find that debtor falsely testified that Kimberly was actively involved in Willamette Electric Group.

    iii. <u>Kimberly was involved in attempting to sell lots owned by Avalon Investment Group, LLC in Tillamook, Oregon</u>.

Debtor testified that the lots were owned by Kimberly's company, Avalon Investment Group, and that he did not really know much about them but merely helped Kimberly out with the lots when Kimberly asked him for assistance. Exh. 4 at 38:7-39:25, 40:15-41:4, 154:7-155:18, 162:4-18. Although he did not directly testify that Kimberly was involved in attempting to sell the lots, he did testify that he was not marketing the lots himself, but only doing it for Kimberly's company, and that his involvement was minimal.

That testimony was patently false. Dan Larson testified at length about his involvement with debtor in the proposed

M. Vivienne Popperl
Fred Allman
June 10, 2009
Page 10

development of the lots in Tillamook. Debtor took Larson up in a helicopter to view the lots from the air. Debtor and Larson agreed that Larson would be the builder of the houses on the lots. Larson understood that debtor was purchasing the lots personally, and that debtor was going to sell the lots after the homes were built.

Exhibit 39 is the letter of intent from debtor, as "general manager" of Avalon Investment Group, to purchase the lots from Ed Myers. Exhibits 40 and 44 are Vacant Land Standard Sales Agreements, which show that Avalon Investment Group, as seller, agreed with Larson, as buyer, to sell certain of the lots to Larson. The agreements were signed by debtor as "seller." The signature lines did not show that debtor was acting in any representative capacity. Debtor developed a complex deal for the building of the houses and the sale of the lots, including having Larson pay $10,000 for particular lots, then giving Larson back checks for $10,000 as part of Larson's "profits." The checks, which were written by Kimberly on her account, were postdated. When Larson went to cash the checks, the account had been closed. Larson testified that all of his dealings and negotiations regarding the Tillamook property were with debtor, and he never had any business discussions with Kimberly.

William Reber, who did excavation work at the Worden Hill Road property, testified that debtor discussed the Tillamook lots with him, represented that debtor owned the lots, and offered Reber one of the lots in payment for the excavation work Reber was doing. Reber also testified that the signatures on the contract with Dan Larson's construction company for construction of a house on one of the lots, Exh. 43, was not his or his wife's, and that he had never seen the agreement until the night before the trial.

Bruce Pulley, a licensed real estate appraiser, testified that he did appraisals for debtor of the lots in Tillamook. Pulley had lost his house to a fire, and debtor came up with a complex scheme involving building a house on one of the lots in Tillamook to try to help Pulley get his home repaired and paid for. This scheme never worked. Pulley did not have any business dealings with Kimberly with regard to the lots or the appraisals. His only contact with her was social.

Joe Marks testified that he knew debtor through radio antenna installation work. Debtor told Marks that debtor had some property deals going on at the coast, and that when the deals closed, debtor would repay money Marks had loaned to

M. Vivienne Popperl
Fred Allman
June 10, 2009
Page 11

debtor. Debtor flew Marks over the Tillamook property in a helicopter to see the lots. Marks knew Kimberly but never had any business discussions with her. His business was always conducted with debtor.

Kimberly testified that she did not know any specifics about the Tillamook lots, other than that debtor was heading up the project to try to sell the lots. She was not involved in any negotiations for their purchase or sale. Exh. 13 at 35:3-36:13; Exh. 21 at 30:3-31:11, 77:18-79:9.

I find that debtor's testimony that Kimberly was involved in trying to sell the Tillamook lots for Avalon Investment Group was false. There is no testimony or evidence that Kimberly had any direct involvement with the Tillamook lots. The testimony establishes that debtor was the person who negotiated for the purchase of the lots, dealt with the builder on the lots, and negotiated for the sale of the lots.

  iv. <u>Debtor had no control over Avalon Communications Group, LLC, and Kimberly sold all of the assets of that business on eBay in the fall of 2007</u>.

Debtor testified that Kimberly owned Avalon Communications Group, LLC, and that he did not have any control over that company, but merely helped out from time to time. Exh. 4 at 30:9-12, 31:15-22, 144:13-17, 171:4-11. He also testified that Kimberly sold all of the assets of Avalon Communications on eBay in the fall of 2007. Exh. 4 at 144:21-145:15, 145:21-146:14.

The testimony established that debtor had a background in communications, including ham radio work and maintenance of radio antennas. Matthew Goldberg, who represented Forney's bankruptcy trustee, testified that his contact for the potential purchase of the communications business out of Forney's bankruptcy estate was with debtor on behalf of Avalon Investment Group. Rodopho Camacho, the chapter 7 trustee for the Forney bankruptcy estate, followed up on a letter of intent from Avalon Investment Group, signed by debtor as general manager, to Forney regarding the proposed purchase of the business. He had discussions with debtor about the possible purchase of the business. He did not have any communications with Kimberly.

Terri Cromwell testified that she loaned $48,000 to debtor to help him purchase Wi-fi Northwest, which he represented to her would be owned by Cromwell, debtor, and Dan Larson. Kimberly was not to be involved in the business.

This evidence establishes that Kimberly was not actively involved in Avalon Communications Group, and that the business for that company was conducted by debtor.

As for debtor's testimony that Kimberly had sold all of the assets of Avalon Communications Group on eBay, that testimony was shown to be false by the fact that, when Peter McKittrick, the bankruptcy trustee in this bankruptcy case, went to the Worden Hill Road property, he found a very large amount of electronic and communications equipment at the property. See Exh. 49. Kimberly did not have any involvement with the communications or electronic business. McKittrick sold the equipment along with other assets at the site for $65,000.

Kimberly testified that there was an eBay account set up under her name for the purpose of buying and selling communications equipment, but that she was not actively involved in the sales. Exh. 13 at 95:2-96:5; Exh. 21 at 56:25-58:11.

The evidence establishes that debtor in fact had control over Avalon Communications Group and he managed the business. The evidence also establishes that Kimberly did not sell all of the assets of the business on eBay in the fall of 2007 or any other time.

 v. <u>Kimberly handwrote her income tax returns and debtor only entered the information she prepared into a computerized tax program</u>.

Although the transcript of the § 341(a) meeting shows that debtor testified that he did not prepare Kimberly's tax returns but merely transferred information she had written by hand into a computerized tax program, even if this statement is false, I do not consider it material. Therefore, I will not rely on it in my decision to deny discharge.

 vi. <u>Debtor had no interest in any real estate, vehicles, or equipment at the time he filed bankruptcy</u>.

Debtor testified that he did not own any interest in real estate, vehicles, or equipment at the time of his bankruptcy. Exh. 4 at 17:23-18:13, 20:3-19, 35:22-25, 36:25-38:6, 62:6-23, 130:23-131:3 (debtor did not have an interest in the Worden Hill Road property); Exh. 4 at 58:21-24, 63:11-13, 66:17-24, 68:7-17 (vehicles are owned by Kimberly); Exh. 4 at 53:24-54:5, 54:17-55:22, 69:21-70:7, 171:4-11 (debtor did not have any interest in

equipment; all personal property he owned was listed on his Schedule B).

In fact, none of that was true. Although his name was not on the documents relating to the purchase of the Worden Hill Road property, debtor and Kimberly were married at the time they purchased the property. Despite his testimony to the contrary, I am convinced by the evidence that he lived there at least for some time after the property was purchased. Exh. 21 at 10:13-11:6. Debtor at all times had access to the property. Exh. 21 at 11:22-12:7.

Before debtor and Kimberly were married, debtor owned a condominium in Portland. At some point after they were married, debtor may have transferred all or part of his interest in the condominium to Kimberly. Exh. 13 at 55:5-19, Exh. 21 at 106:20-25, 108:14-109:13. When they decided to move out of the condominium, they looked for a new property together. Exh. 21 at 126:13-25. They both signed a listing agreement to sell the condominium. Exh. 21 at 73:9-76:13. They found the property on Worden Hill Road. Kimberly obtained a loan for the purchase of that property. Exh. 21 at 126:9-12. The down payment of $250,000 came from Kimberly's mother. Exh. 13 at 54:8-14. The property was purchased in Kimberly's name. Exh. 34. The condominium sold after the Allmans had moved into the Worden Hill Road property.

Terri Cromwell testified that, during her drives to job locations with debtor, debtor told her that he wanted the Worden Hill Road property because it was a good site for a radio antenna. After debtor and Kimberly moved to the Worden Hill Road property, Cromwell helped debtor rough out a road and stake out a space on the property for a radio tower and shop. Cromwell testified that debtor lived at the Worden Hill Road property from the time it was purchased until sometime in 2008.

Joe Marks testified that in his many dealings with debtor, it appeared that debtor and Kimberly owned the property together and lived together there.

From this testimony, I conclude that debtor had an interest in the Worden Hill Road property. He and Kimberly were married when it was purchased, they lived there together and treated the property as theirs. His testimony to the contrary was false.

The evidence also establishes that debtor had an interest in both vehicles and equipment. Cromwell testified that debtor and

M. Vivienne Popperl
Fred Allman
June 10, 2009
Page 14

Kimberly appeared to own jointly two vehicles, a Hummer and a Porsche Cayenne. There was also a small red Porsche at the property that everyone knew was Kimberly's car. Joe Marks also testified that both Kimberly and debtor appeared to jointly own the vehicles except for the small red Porsche. The license plate on the Hummer said "RF GUY," which was the email address debtor had used in connection with his former business, RFW Communications. Debtor was the one who drove the Hummer most of the time, although Kimberly would drive it occasionally to haul something.

Debtor had a large amount of equipment at the Worden Hill Road property. McKittrick testified to the extensive amount of electronic and radio equipment found at the property, which he later sold at auction. Although there was testimony that the communications equipment belonged to Avalon Communications Group, it is clear from the evidence that Avalon Communications Group was a family enterprise, and was not owned solely by Kimberly. Kimberly testified that, when they were married, debtor had a lot of equipment. Exh. 21 at 32:15-33:6. She also testified that all of the property at the house belonged either to her, their daughter, or debtor, except for some miscellaneous items that belonged to Kimberly's mother and some club communications equipment. Exh. 13 at 70:25-71:5. McKittrick testified that, after he became trustee for the estate, Kimberly told him that debtor had gotten some of his friends in the radio business to come and pick up some of the communications equipment that had been at the property and asked them to sell it. McKittrick was able to recover the communications items that were taken by debtor's friends. McKittrick sold the personal property that was at the Worden Hill Road property at auction for approximately $65,000. Much of that personal property was owned by, in possession of, or under the control of debtor.

This evidence establishes that debtor had control and possession of significant assets, including electronics and communications equipment, and that he at least had an interest in, if he did not outright own, the vehicles that were on the property, other than the small red Porsche. His testimony to the contrary was false.

      vii. <u>Debtor listed in his bankruptcy schedules all personal property assets in which he had an interest, including those he controlled, was in possession of, or for which he was the primary user</u>.

M. Vivienne Popperl
Fred Allman
June 10, 2009
Page 15

    Debtor testified that he did not have any interest in and was not in possession, control, or the primary user of personal property assets other than what he listed in his Schedule B, including any radio-related equipment. Exh. 4 at 7:12-8:7, 53:2-55:22, 56:19-23, 57:14-58:6, 69:21-70:11. In his schedules, he listed personal property valued at $1,945 total, including miscellaneous household goods valued at $950, miscellaneous books valued at $175, clothing valued at $625, and tools valued at $150. He did not list an interest in any equipment. Exh. 2.

    The same evidence that establishes that debtor actually had an interest in personal property, discussed above, also establishes that his testimony that he did not have possession or control of, nor was he the primary user of, the personal assets was false.

    B.    <u>Materiality</u>

    False statements under oath that support denying a discharge must be material. Materiality means that the statement relates to "the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property." <u>In re Wills</u>, 243 B.R. 58, 62 (9th Cir. BAP 1999).

    There is no question that the false statements debtor made were material. They related to his business dealings, including his control over and involvement in numerous family businesses for which he was primarily responsible. They also related to his assets, including real estate, vehicles, and equipment. These are precisely the types of information that bear on creditors' and the trustee's ability to discover assets or fully investigate debtor's financial condition and business dealings prepetition.

    C.    <u>Intent</u>

    Based on the evidence presented in this case, I find that debtor's false statements were knowingly and fraudulently made. Debtor chose not to participate in the trial, so I do not have the benefit of his testimony, any exhibits from him, or testimony of other witnesses on his behalf that might provide a basis for finding some justification for his falsehoods.

    Debtor testified falsely about a myriad of material matters, including fundamental information about his assets and business dealings. He made multiple omissions of material assets. In fact, he did not disclose any assets of any substance at all,

leaving it to the trustee and his creditors to find that information through other means. He engaged in a clear pattern of falsity.

I find actual intent in this case, based on the number of material inaccuracies in debtor's testimony and his pattern of falsehoods. There is nothing in the record that would support anything other than an inference of massive fraud. Debtor's testimony was utterly incredible.

Because debtor made multiple material false statements, which he made intentionally and fraudulently, I will deny his discharge pursuant to § 727(a)(4)(A).

2.  Concealment of records - § 727(a)(3)

The UST alleges that debtor concealed his records of his financial condition and therefore should be denied a discharge under § 727(a)(3).

Section 727(a)(3) provides for denial of a discharge when the debtor has concealed or failed to keep "any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case[.]"

In debtor's schedules, he listed 18 pages of creditors holding unsecured claims, all with question marks for the amount of the claim. He estimated that the total owing to those creditors was $900,000.

Debtor testified at his § 341(a) meeting that he lacked information from which he could determine the amount he owed to creditors because he did not have documentation available relating to those debts. Exh. 4 at 10:15-11:22, 12:1-13:6. He testified that he had very few financial records anymore, because he had shipped his financial records to Yakima, Washington. Exh. 4 at 14:25-15:5. He testified that there were no records at the Worden Hill Road property relating to his financial affairs. Exh. 4 at 16:1-17:13; 150:3-7.

In fact, McKittrick testified that he found extensive records relating to debtor's financial dealings at the Worden Hill Road property. He found filing cabinets full of records, which were in folders labeled in debtor's handwriting and

M. Vivienne Popperl
Fred Allman
June 10, 2009
Page 17

alphabetically arranged. All of the records were in locations to which debtor had access.

Kimberly testified that debtor had taken over the office in the house, using the equipment and filing cabinets there. Kimberly had to use her laptop computer in the bedroom because debtor had taken over the home office.

This testimony establishes that debtor concealed his financial records by falsely testifying that he did not have any financial records available to him, and that all of his financial records had been sent to Yakima, Washington.

Debtor has not provided any justification for the concealment. Therefore, the UST has proven that debtor concealed financial records from which his financial condition could be ascertained, without any justification. I will deny him a discharge pursuant to § 727(a)(3).

## CONCLUSION

This case presents the story of a debtor who gave extensive false testimony about his financial condition and who concealed his financial records from which his true financial condition could be determined. The false testimony on which I rely to deny discharge is indicative of debtor's pervasive falsehoods. Debtor's testimony was nearly entirely incredible.

Debtor's discharge will be denied for giving false oaths in connection with this case, § 727(a)(4)(A), and for concealing his financial records, § 727(a)(3). Ms. Popperl should submit the judgment.

Very truly yours,

ELIZABETH L. PERRIS
Bankruptcy Judge

cc: Peter McKittrick